# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

GRACE BAUMGARTEN; an individual,
MARK BAUMGARTEN; an individual,
GARY FOREN; an individual,
JOHN KUCINSKAS; an individual,
JEAN KUCINSKAS; an individual,
LINDA KATZ; an individual,
WILLIAM KATZ; an individual,
KATHRYN FREDE; an individual,
RICHARD FREDE; an individual,
MICHAEL LITTLE; an individual,
BARBARA LITTLE; an individual,
SANDRA OLIVER; an individual,
VITTHAL PATEL; an individual,
VILMA PATEL; an individual,

        Plaintiffs,

        vs.

MERCK & CO., INC., MERCK SHARP &
DOHME CORP., and McKESSON CORP.,

        Defendants.

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs by and through his counsel, SADAKA ASSOCIATES, LLC, allege against

Defendants MERCK & CO., INC., MERCK SHARPE & DOHME, CORP., and McKESSON

CORP., (collectively, "Defendants"), on information and belief, as follows:

## PARTIES

1.      Plaintiff GRACE BAUMGARTEN at all times relevant to this action was and is a

citizen of the state of New Jersey, residing in Bloomfield, New Jersey 07703.  Plaintiff GRACE

BAUMGARTEN was inoculated with Defendants' Zostavax vaccine on or about May 31, 2016 at

Summit Medical Group, whose corporate office is located in Berkeley Heights, New Jersey 07922

for routine health maintenance and for the prevention of shingles.  The vaccine did not prevent shingles, but rather caused Plaintiff GRACE BAUMGARTEN to contract a persistent strain of herpes zoster.   Shortly after receiving Defendants' Zostavax vaccine, Plaintiff GRACE BAUMGARTEN developed skin sensitivity, a burning sensation throughout her torso, and feelings of numbness and tingling in her feet.  In response to these complaints, Plaintiff GRACE BAUMGARTEN presented to Jaclyn Brancato, D.O. and was diagnosed as suffering from singles. Thereafter, Plaintiff GRACE BAUMGARTEN's feeling of numbness, weakness, and tingling in her extremities worsened in intensity and duration, and on January 7, 2017, Plaintiff GRACE BAUMGARTEN presented to Daniel Hart, M.D. and was diagnosed as suffering from acute transverse myelitis. As a direct and proximate result of these malfunctions, Plaintiff GRACE BAUMGARTEN suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff GRACE BAUMGARTEN has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

2.     Plaintiff MARK BAUMGARTEN at all times relevant to this action was and is a citizen of the state of New Jersey, residing in Bloomfield, New Jersey 07703.  At all times relevant to this action, Plaintiff MARK BAUMGARTEN is the husband of Plaintiff GRACE BAUMGARTEN.

3.     Plaintiff GARY FOREN at all times relevant to this action was and is a citizen of the state of Arkansas, residing in Prairie Grove, AR 72753.  Plaintiff GARY FOREN was inoculated with Defendants' Zostavax vaccine on or about July 17, 2015 at Sterling Drug located in Prairie Grove, AR routine health maintenance and for the prevention of shingles.  The vaccine did not prevent shingles, but rather caused Plaintiff GARY FOREN to contract a persistent strain of herpes zoster.  Shortly after receiving Defendants' Zostavax vaccine, Plaintiff GARY FOREN

began to experience pain, loss of strength in his left leg, and difficulty walking.  Thereafter, Plaintiff GARY FOREN lost the ability to walk. As a direct and proximate result of these malfunctions, Plaintiff GARY FOREN suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff GARY FOREN has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

4.      Plaintiff JOHN KUCINSKAS at all times relevant to this action was and is a citizen of the state of Massachusetts, residing in Uxbridge, MA 01569.  Plaintiff JOHN KUCINSKAS was inoculated with Defendants' Zostavax vaccine on or about 2016 at Hopkinton Family Practice located in Hopkinton, MA 01748 for routine health maintenance and for the prevention of shingles. The vaccine did not prevent shingles, but rather caused Plaintiff JOHN KUCINSKAS to contract a persistent strain of herpes zoster.  Shortly after receiving Defendants' Zostavax vaccine, Plaintiff JOHN KUCINSKAS began to experience post herpetic nerve pain.  Thereafter, Plaintiff JOHN KUCINSKAS was diagnosed with a shingles outbreak on both his legs and on his back, which lead to significant scarring.  As a direct and proximate result of these malfunctions, Plaintiff JOHN KUCINSKAS suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff JOHN KUCINSKAS has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

5.      Plaintiff JEAN KUCINSKAS at all times relevant to this action was and is a citizen of the state of Massachusetts, residing in Uxbridge, MA 01569.  At all times relevant to this action, Plaintiff JEAN KUCINSKAS is the wife of Plaintiff JOHN KUCINSKAS.

6.      Plaintiff LINDA KATZ at all times relevant to this action was and is a citizen of the state of New Jersey, residing in Tinton Falls, NJ 07753.  Plaintiff KINDA KATZ was

inoculated with Defendants' Zostavax vaccine on October 22, 2016 at Walgreens Pharmacy Store # 01796 located in Neptune, NJ 07753 for routine health maintenance and for the prevention of shingles. The vaccine did not prevent shingles, but rather caused Plaintiff LINDA KATZ to contract a persistent strain of herpes zoster. Shortly after receiving Defendants' Zostavax vaccine, Plaintiff LINDA KATZ began to experience shooting pains around her temple, and a feeling of itchiness and discomfort throughout her body. In response to these complaints, on October 27, 2016, Plaintiff LINDA KATZ presents to Nader Habib, M.D. at Central Jersey Urgent Care and was diagnosed as suffering from shingles. Thereafter, on November 18, 2016, Plaintiff LINDA KATZ returned to Dr. Habib for a follow-up appointment and was diagnosed as suffering from post-herpetic neuralgia. As a direct and proximate result of these malfunctions, Plaintiff LINDA KATZ suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff LINDA KATZ has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

7.     Plaintiff WILLIAM KATZ at all times relevant to this action was and is a citizen of the state of New Jersey, residing in Tinton Falls, NJ 07753. At all times relevant to this action, Plaintiff WILLIAM KATZ is the husband of Plaintiff LINDA KATZ.

8.     Plaintiff KATHRYN FREDE at all times relevant to this action was and is a citizen of the state of Missouri, residing in Ofallon, MO 63368. Plaintiff KATHRYN FREDE was inoculated with Defendants' Zostavax vaccine on or about May 11, 2015 at Schnucks Markets located in Lake St. Louis, MO 63367 for routine health maintenance and for the prevention of shingles. The vaccine did not prevent shingles, but rather caused Plaintiff KATHRYN FREDE to contract a persistent strain of herpes zoster. Shortly after receiving Defendants' Zostavax vaccine, Plaintiff KATHRYN FREDE experienced sudden hearing loss in her left ear, leading to total

hearing loss in her left ear.  As a direct and proximate result of these malfunctions, Plaintiff KATHRYN FREDE suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff KATHRYN FREDE has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

9.    Plaintiff RICHARD FREDE at all times relevant to this action was and is a citizen of the state of Missouri, residing in Ofallon, MO 63368.  At all times relevant to this action, Plaintiff RICHARD FREDE is the husband of Plaintiff KATHRYN FREDE.

10.    Plaintiff MICHAEL LITTLE at all times relevant to this action was and is a citizen of the state of Alabama, residing in Huntsville, AL 35802. Plaintiff MICHAEL LITTLE was inoculated with Defendants' Zostavax vaccine on or about June 17, 2016 at Total Sports Care Family Medicine, his primary care physician, located in Huntsville, AL 35801 for routine health maintenance and for the prevention of shingles.  The vaccine did not prevent shingles, but rather caused Plaintiff MICHAEL LITTLE to contract a persistent strain of herpes zoster.  Shortly after receiving Defendants' Zostavax vaccine, Plaintiff MICHAEL LITTLE began to experience trouble in raising his right foot, and pain traveling up his right leg emanating from his right foot.  Plaintiff MICHAEL LITTLE presented to Neurology Consultants of HSV P.C. and was diagnosed with multifocal motor neuropathy.  Thereafter, Plaintiff MICHAEL LITTLE presented to Pathology Associates, P.C. and was diagnosed as suffering from polyradiculoneuropathy and chronic inflammatory demyelinating polyneuritis.  As a direct and proximate result of these malfunctions, Plaintiff MICHAEL LITTLE suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff MICHAEL LITTLE has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

11.     Plaintiff BARBARA LITTLE at all times relevant to this action was and is a citizen of the state of Alabama, residing in Huntsville, AL 35802.  At all times relevant to this action, Plaintiff BARBARA LITTLE is the wife of Plaintiff MICHAEL LITTLE.

12.     Plaintiff SANDRA OLIVER at all times relevant to this action was and is a citizen of the state of Maine, residing in Buxton, ME 04903.  Plaintiff SANDRA OLIVER was inoculated with Defendants' Zostavax vaccine on or about October 2014 at Hannaford Pharmacy located in Buxton, ME 04093 for routine health maintenance and for the prevention of shingles.  The vaccine did not prevent shingles, but rather caused Plaintiff SANDRA OLIVER to contract a persistent strain of herpes zoster.  Shortly after receiving Defendants' Zostavax vaccine, Plaintiff SANDRA OLIVER experienced feeling of dizziness and feeling lightheaded, and developed painful blisters on her neck.  Thereafter, Plaintiff SANDRA OLIVER presented to her primary care physician and was diagnosed with shingles, which lead to severe scarring throughout her body.  As a direct and proximate result of these malfunctions, Plaintiff SANDRA OLIVER suffered painful injuries and damages, and required extensive medical care and treatment.   As a further proximate result, Plaintiff SANDRA OLIVER has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

13.     Plaintiff VITTHAL PATEL at all times relevant to this action was and is a citizen of the state of Florida, residing in Jacksonville, FL 32224.  Plaintiff VITTHAL PATEL was inoculated with Defendants' Zostavax vaccine on or about August 26, 2016 at Family Care Partners, his primary care physician, located in Jacksonville, FL 35520.  The vaccine did not prevent shingles, but rather caused Plaintiff VITTHAL PATEL to contract a persistent strain of herpes zoster.  Shortly after receiving Defendants' Zostavax vaccine, Plaintiff VITTHAL PATEL developed blisters all over his body, and began to experience numbness, burning, and weakness of

his right lower extremity. In response to these complaints, Plaintiff VITTHAL PATEL presented to Christopher G. Potter, M.D., a neurologist, and was diagnosed with polyridiculopathy, and post herpetic neuralgia. As a direct and proximate result of these malfunctions, Plaintiff VITTHAL PATEL suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff VITTHAL PATEL has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

14.    Plaintiff VILMA PATEL at all times relevant to this action was and is a citizen of the state of Florida, residing in Jacksonville, FL 32224. At all times relevant to this action, Plaintiff VILMA PATEL is the wife of Plaintiff VITTHAL PATEL.

15.    Defendant MERCK & CO., INC. ("Merck") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey. At all times relevant to this action, Merck developed, tested, designed, set specifications for, licensed, manufactured, prepared, compounded, assembled, packaged, processed, labeled, marketed, promoted, distributed, and/or sold the Zostavax vaccine to be administered to patients throughout the United States, including New York. Merck has conducted business and derived substantial revenue from within the State of New York, from including, but not limited to, its business activities related to the Zostavax vaccine.

16.    Defendant MERCK SHARP & DOHME CORP. is a wholly-owned subsidiary of Merck and part of the Merck family of companies. Defendant MERCK SHARP & DOHME CORP. is a corporation organized and existing under the laws of the State of New Jersey with its headquarters located at 2000 Galloping Hill Road Kenilworth, New Jersey. At all times relevant to this action, Defendant MERCK SHARP & DOHME CORP., developed, tested, designed, set specifications for, licensed, manufactured, prepared, compounded, assembled, packaged,

processed, labeled, marketed, promoted, distributed, and/or sold the Zostavax vaccine to be administered to patients throughout the United States, including New York. Defendant MERCK SHARP & DOHME has conducted business and derived substantial revenue from within the State of New York, from including, but not limited to, its business activities related to the Zostavax vaccine within this District.

17.    Defendant McKESSON CORP. (hereinafter "McKesson") is a Delaware Corporation with its principal place of business at 2710 Gateway Oaks Drive, Sacramento, California 95833.  At all relevant times, McKesson was in the business of labeling, selling, marketing, promoting, packaging, re-packaging, distributing, and selling the Zostavax vaccine, including the Zostavax vaccine that was administered to Plaintiffs.  McKesson does business throughout the United States and in the State of New York, and regularly, continuously, and presently does business with the State of New York, and throughout this District, including labeling, marketing, promoting, packaging, re-packing, labeling, selling, and distributing the Zostavax vaccine.  McKesson, independently and within the scope of the agency relationship to Merck, develop and disseminated marketing materials, including but not limited to prescribing guidelines, instructions for use, patient information sheets, labels, Vaccine Information Sheets, brochures, pamphlets, and other promotional materials to promote Zostavax at all times relevant to this case.  McKesson, does business throughout the United States, and regularly, continuously, and presently does business within New York, and throughout this District, including the manufacturing, marketing, selling and distributing the Zostavax vaccine, independently and as an agent of Merck and/or Merck Sharpe and Dohme Corp.

18.    Furthermore, at all times relevant hereto, the Defendants manufactured, promoted, marketed and sold the Zostavax vaccine within this District.

19.     Based upon information and belief, the Defendants are, and was at all times relevant hereto, duly authorized to conduct business in New York.

20.     Based upon information and belief, at all times relevant hereto, the Defendants regularly conducted and solicited business within New York and continue to do so.

21.     Based upon information and belief, Merck, either directly or through its agents, servants and employees, does business in New York, and at all times relevant hereto, has sold and distributed Zostavax in New York.

22.     The Defendants derive substantial revenue from goods used or consumed in New York.

23.     Based upon information and belief, the Defendants advertised its Zostavax vaccine to patients, doctors and hospitals in New York and/or other medical facilities located in New York.

24.     Based on information and belief, the Defendants advertise or otherwise promote thier business in New York.

25.     Based on information and belief, the Defendants reasonably expect to be subject to New York product liability law.

## JURISDICTION

26.     Plaintiffs bring their complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a) as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

27.     Venue properly lies with the Court because Defendants are found in, inhabit, or transact business in this District.

## FACTS:

28.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

29.    Plaintiff GRACE BAUMGARTEN at all times relevant to this action was and is a citizen of the state of New Jersey, residing in Bloomfield, New Jersey 07703. Plaintiff GRACE BAUMGARTEN was inoculated with Defendants' Zostavax vaccine on or about May 31, 2016 at Summit Medical Group, whose corporate office is located in Berkeley Heights, New Jersey 07922 for routine health maintenance and for the prevention of shingles. The vaccine did not prevent shingles, but rather caused Plaintiff GRACE BAUMGARTEN to contract a persistent strain of herpes zoster. Shortly after receiving Defendants' Zostavax vaccine, Plaintiff GRACE BAUMGARTEN developed skin sensitivity, a burning sensation throughout her torso, and feelings of numbness and tingling in her feet. In response to these complaints, Plaintiff GRACE BAUMGARTEN presented to Jaclyn Brancato, D.O. and was diagnosed as suffering from singles. Thereafter, Plaintiff GRACE BAUMGARTEN's feeling of numbness, weakness, and tingling in her extremities worsened in intensity and duration, and on January 7, 2017, Plaintiff GRACE BAUMGARTEN presented to Daniel Hart, M.D. and was diagnosed as suffering from acute transverse myelitis. As a direct and proximate result of these malfunctions, Plaintiff GRACE BAUMGARTEN suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff GRACE BAUMGARTEN has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

30.    Plaintiff MARK BAUMGARTEN at all times relevant to this action was and is a citizen of the state of New Jersey, residing in Bloomfield, New Jersey 07703. At all times relevant to this action, Plaintiff MARK BAUMGARTEN is the husband of Plaintiff GRACE BAUMGARTEN.

31.     At all times hereinafter mentioned, Merck designed, manufactured, licensed, labeled, tested, distributed, marketed and sold the Zostavax vaccine.

32.     Zostavax was designed, developed, marketed, and sold with the intended purpose of preventing shingles, which is caused by the varicella zoster virus ("VZV").

33.     Varicella zoster is a virus that causes chickenpox.

34.     Once the VZV causes chickenpox, the virus remains inactive (dormant) in the nervous system for many years.

35.     VZV can be reactivated due to factors, such as disease, stress, aging, and immune modulation caused by vaccination.

36.     When reactivated, VZV replicates in nerve cells and is carried down the nerve fibers to the area of skin served by the ganglion that harbored the dormant virus.

37.     In May of 2006, the U.S. Food and Drug Administration ("FDA") approved the Zostavax vaccine to be marketed and sold in the United States by Merck.

38.     Zostavax was initially indicated for the "the prevention of herpes zoster (shingles) in individuals 60 years of age and older when administered as a single-dose."  FDA Approval Letter, May 25, 2006.

39.     FDA approval was based in large part on the results of the Shingles Prevention Study (SPS) supported by Merck.

40.     The results of the SPS were published in the New England Journal of Medicine on June 2, 2005. The paper was titled "A Vaccine to Prevent Herpes Zoster and Postherpetic Neuralgia in Older Adults".  N. Engl. J. Med. 2005; 352(22):2271-84.

    a.  Shingles results from reactivation of latent varicella zoster virus (VZV), which is the virus that causes chickenpox.  The incidence and severity of shingles increases as people age.

    b.  As further described in this paper, "[t]he pain and discomfort associated with herpes zoster can be prolonged and disabling, diminishing the patient's quality of life and ability to function to a degree comparable to that in diseases such as congestive heart failure, myocardial infarction, diabetes mellitus type 2, and major depression." N. Engl. J. Med. 2005; 352(22) at 2272.

    c.  The Zostavax vaccine is essentially the same vaccine as that used for chickenpox, except significantly stronger.

    d.  Zostavax contains live VZV. The virulence of the virus is reduced or "attenuated". Attenuated vaccines are designed to activate the immune system with the decreased risk of actually developing the disease.

    e.  Zostavax is developed from a live attenuated version of the Oka/Merck VZV vaccine strain.

    f.  One of the paper's more significant findings was "[t]he greater number of early cases of herpes zoster in the placebo group, as compared with the vaccine group, and the fact that no vaccine virus DNA was detected, indicate that the vaccine did not cause or induce herpes zoster."

41.   A risk of using a live virus vaccine is that it is not weakened enough or is "under attenuated."

42.   Under-attenuated live virus creates an increased risk of developing the disease the vaccine was to prevent.

43.   Under-attenuated live VZV has been shown to reactivate. Leggiadro, R. J. (2000). Varicella Vaccination: Evidence for Frequent Reactivation of the Vaccine Strain in Healthy Children. The Pediatric infectious disease journal, 19(11), 1117–1118; Krause, P. R., & Klinman, D. M. (2000). Nature Medicine, 6(4), 451–454.

44.   Once injected, attenuated live virus has been shown to recombine into more virulent strains causing disease.

45.   Shingles is a reactivation of the latent VZV.

46.   The approval granted by the FDA to allow the selling and marketing of this vaccine came with certain post-marketing commitments that Merck agreed to complete to, among other things, insure the safety of this vaccine. These included the following:

    a.  A randomized, placebo-controlled safety study to assess the rates of serious adverse events in 6,000 people receiving the vaccine as compared to 6,000 who receive a placebo.

    b.  An observational study using a health maintenance organization (HMO) and 20,000 vaccinated people to address safety issues in the course of clinical practice. This study is specifically to detect "potential safety signals following administration of Zostavax." This study was to be submitted to the FDA by December 2008.

47.    Since the publication of the SPS in the New England Journal of Medicine, there have been questions raised regarding the safety of Zostavax vaccine in scientific and medical journals.

48.    Zostavax is a stronger, more potent version of Merck's chickenpox vaccine, Varivax.

49.    Varivax contains a minimum of 1,350 PFU (plaque-forming units) of the virus while Zostavax contains a minimum of 19,400 PFU.

50.    In the clinical studies evaluating Zostavax, more than 90% of the vaccinated subjects received 32,300 PFU.

51.    Merck added several adverse reactions to its package insert/prescribing information since Varivax was approved.

    a.  The biological system in which the most adverse reactions were added was the nervous system.

    b.  Added reactions include: encephalitis, cerebrovascular accident, transverse myelitis, Guillain-Barré syndrome, Bell's palsy, ataxia, non-febrile seizures, aseptic meningitis, dizziness, and paresthesia.

52.    As of July 2012, the patient information sheet, label, and prescribing information distributed with the Zostavax vaccine contain no clear reference to the potential risk of viral infection.

53.    Individuals with compromised immune systems should not receive a live virus vaccine because those individuals can develop the disease that the vaccine is designed to prevent.

54.      The patient information sheet, as well as the label and prescribing information for Zostavax at all times relevant hereto, did not adequately, if at all, address the risk of viral infection. All that was addressed is the concern that a rash and itching might develop at the injection site. This is despite the fact that shingles was a noted occurrence during clinical trials of the vaccine.

55.      The prescribing information for Zostavax contains a warning that "[t]ransmission of vaccine virus may occur between vaccinees and susceptible contacts". The risk of transmission of vaccine virus is due to active viral infection in individuals receiving the Zostavax vaccine.

56.      The patient information sheet, as well as the label and prescribing information for Zostavax at all times relevant hereto, did not adequately, if at all, address the risk of viral infection or possible diseases of the nervous system.  This is despite the fact that Varivax, a less potent vaccine, has added several neurological diseases and symptoms as adverse reactions to the Varivax vaccine.

57.      Since Zostavax's introduction in 2006, vaccine adverse event reports (VAERs) appeared in significant numbers addressing various adverse effects, including, but not limited to, viral infection resulting in disease of the central nervous system, including acute disseminated encephalomyelitis and acute transverse myelitis.

58.      On February 12, 2018, the Centers for Disease Control and Prevention ("CDC") updated the Vaccine Information Statement for Zostavax by adding, *inter alia*, a warning that the live shingles vaccine can cause shingles.

59.      Other than postherpetic neuralgia, shingles can lead to other serious complications, such as scarring, bacterial superinfection, allodynia, cranial and motor neuron palsies, pneumonia, encephalitis, visual impairment, hearing loss, and death.

60.     It follows that given the increased risk of viral infection due to vaccination, such complications are also possible complications of Zostavax.  It also follows that post-vaccination viral infection can cause significant issues in the nervous system due to the replication of the latent virus in the nervous system.

61.     Despite this information and the potential correlation between being administered the Zostavax vaccine and within a relatively short period of time developing an infection, leading to the development of shingles or varicella-zoster virus pneumonia, Merck failed to properly address and provide this information both to the patient and the medical providers prescribing the vaccine.

62.     As a direct and proximate result of Merck's defective Zostavax vaccine, the Plaintiffs' symptoms and diagnoses have resulted in physical limitations not present prior to using Merck's product.

63.     As a result of the manufacture, marketing, advertising, promotion, distribution and/or sale of Zostavax, the Plaintiffs sustained severe and permanent personal injuries.  Further, as a tragic consequence of Merck's wrongful conduct, the Plaintiffs suffered serious, progressive, permanent, and incurable injuries, as well as significant conscious pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, physical impairment and injury.

64.     The Plaintiffs have incurred and will continue to incur medical expenses and other economic harm as a direct result of use of Zostavax.

## COUNT I:
## NEGLIGENCE

65.     The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

66.    Merck had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Zostavax including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

67.    Merck failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Zostavax because Merck knew, or should have known, that its product caused viral infection, and was therefore not safe for administration to consumers.

68.    Merck failed to exercise due care in the labeling of Zostavax and failed to issue to consumers and/or their healthcare providers adequate warnings as to the risk of serious bodily injury, including viral infection, resulting from its use.

69.    Merck continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Zostavax posed a serious risk of bodily harm to consumers.  This is especially true given its tenuous efficacy.

70.    Merck knew, or should have known, that consumers, such as the Plaintiffs, would foreseeably suffer injury as a result of Merck's failure to exercise ordinary care.

71.    As a direct and proximate consequence of Merck's negligence, the Plaintiffs sustained serious personal injuries and related losses including, but not limited to, the following:

a.    The Plaintiffs required and will continue to require healthcare and services;
b.    The Plaintiffs incurred and will continue to incur medical and related expenses; and
c.    The Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and

attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT II:
## PRODUCTS LIABILITY – DESIGN DEFECT

72.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

73.    Merck designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the Zostavax vaccine.

74.    The Zostavax vaccine was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Merck.

75.    The Zostavax vaccine was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiffs' physicians and/or healthcare providers, and all other consumers of the product, making the product unreasonably dangerous.

76.    The Zostavax vaccine, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Merck was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

77.    Merck's Zostavax vaccine, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Merck was defective in design and formulation, because when it left the hands of Merck, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

78.    At all times relevant to this action, Merck knew and had reason to know that its Zostavax vaccine was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Merck, and when used and administered in the form manufactured and distributed by Merck, and in the manner instructed by Merck to be used and administered to the Plaintiffs and other consumers.

79.    The Plaintiffs' physicians and/or healthcare providers used and administered the Zostavax vaccine for the purpose intended by Merck, and in a manner normally intended to be used and administered, namely for vaccination against shingles (herpes zoster). Merck had a duty to design, create, and manufacture products that were reasonably safe and not unreasonably dangerous for their normal, common, and intended use.  Merck's product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

80.    Merck designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of the Plaintiffs and other consumers.  Merck is therefore strictly liable for the Plaintiffs' injuries and damages sustained proximately caused by the Plaintiffs' use of the product.

81.    The Plaintiffs could not, by the exercise of reasonable care, discover the defective condition of Merck's product and/or perceive its defective dangers prior to its administration by his physicians and/or healthcare providers.

82.    Furthermore, Merck defectively manufactured the subject Zostavax vaccine such that it unreasonably increased the risk of contracting an infection from the vaccine.

83.     Merck's defective Zostavax vaccine was a substantial, proximate, and contributing factor in causing the Plaintiffs' injuries.

84.     As a proximate result of Merck's acts and omissions and the Plaintiffs' use of Merck's defective product, the Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for thier injuries described in this Complaint, including, but not limited to, the following:

   a.    The Plaintiffs required and will continue to require healthcare and services;
   b.    The Plaintiffs incurred and will continue to incur medical and related expenses; and
   c.    The Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT III:
## PRODUCTS LIABILITY – FAILURE TO WARN

85.     The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

86.     Merck designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the Zostavax vaccine.

87.     The Zostavax vaccine was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Merck.

88.    The Zostavax vaccine was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiffs' physicians and/or healthcare providers and all other consumers of the product, making the product unreasonably dangerous.

89.    Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Zostavax vaccine and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product.

90.    Merck's Zostavax vaccine, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Merck, was defective due to the product's inadequate warnings and instructions.  Merck knew, or should have known, and adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, viral infection resulting in shingles, postherpetic neuralgia, or other diseases of the nervous system.

91.    The product was under the exclusive control of Merck and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing a disease in the nervous system due to viral infection.  The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

92.    Notwithstanding Merck's knowledge of the defective condition of its product, Merck failed to adequately warn the medical community and consumers of the product, including the Plaintiffs and his healthcare providers, of the dangers and risk of harm associated with the use and administration of its Zostavax vaccine.

93.    Merck downplayed the serious and dangerous side effects of its product to encourage sales of the product; consequently, Merck placed its profits above its customers' safety.

94.    The product was defective when it left the possession of Merck in that it contained insufficient warnings to alert the Plaintiffs and/or thier healthcare providers to the dangerous risks and reactions associated with it, including possible viral infection of the nervous system or another disease of the nervous system.

95.    Even though Merck knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

96.    The Plaintiffs used Merck's Zostavax vaccine as intended or in a reasonably foreseeable manner.

97.    Merck, as a manufacturer of pharmaceutical products, is held to the level of knowledge of an expert in the field and, further, Merck had knowledge of the dangerous risks and side effects of its product.

98.    The Plaintiffs did not have the same knowledge as Merck and no adequate warning was communicated to thier physician(s) and/or healthcare providers.

99.    Merck had a continuing duty to warn consumers of its Zostavax vaccine, including the Plaintiffs, of the dangers associated with its product, and by negligently and/or wantonly failing to adequately warn of the dangers of the use of its product, Merck breached its duty.

100.    Although Merck knew, or should have known, of the defective nature of its Zostavax vaccine, it continued to design, manufacture, market, and sell its product without providing adequate warnings and instructions concerning the use of its product so as to maximize

sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by its Zostavax vaccine.

101.    As a direct and proximate result of Merck's failure to adequately warn or other acts and omissions of Merck described herein, the Plaintiffs was caused to suffer severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

102.    Merck's failure to warn extended beyond the product's label and into other media available to Merck, including but not limited to advertisements, person-to-person sales calls, medical journal articles, and medical conference presentations.

103.    The Zostavax vaccine, upon information and belief, as manufactured and supplied by Merck, was further defective due to inadequate post-market warnings or instructions because after Merck knew, or should have known, of the risk of serious bodily harm from the administration of its Zostavax vaccine, including, but not limited to, possible viral infection, Merck failed to provide adequate warnings to consumers and/or their healthcare providers about the product, knowing the product could cause serious injury.

104.    The Zostavax vaccine, upon information and belief, as manufactured and supplied by Merck, was defective due to inadequate post-market warnings or instructions when it left Merck's control.

105.    As a proximate result of Merck's acts and omissions and the Plaintiffs' use of Merck's defective product, the Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, the following:

    a.    The Plaintiffs required and will continue to require healthcare and services;
    b.    The Plaintiffs incurred and will continue to incur medical and related expenses; and

    c.    The Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

**WHEREFORE,** the Plaintiffs demand judgment against the Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT IV:
## BREACH OF EXPRESS WARRANTY

106.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

107.    Merck, through its officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that its Zostavax vaccine was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, viral infection, and was adequately tested and fit for its intended use.

    a.    Specifically, Merck stated that "ZOSTAVAX is a vaccine that is used for adults 60 years of age or older to prevent shingles (also known as zoster)."

    b.    Merck also stated that "ZOSTAVAX works by helping your immune system protect you from getting shingles."

    c.    Merck, in the SPS paper, stated that "…the vaccine did not cause or induce herpes zoster."

108.    At the time of making such express warranties, Merck knew and/or should have known that its Zostavax vaccine did not conform to the express warranties and representations and that, in fact, its product was not safe and had numerous serious side effects, including the possibility of viral infection, of which Merck had full knowledge and did not accurately or adequately warn.

109.    The Zostavax vaccine manufactured and sold by Merck did not conform to these representations because it caused serious injury, including diseases of the nervous system and/or viral infection, to consumers such as the Plaintiffs, when used in routinely administered dosages.

110.    Merck breached its express warranties because its product was and is defective for its intended purpose.

111.    The Plaintiffs, through thier physicians and/or other healthcare providers, did rely on Merck's express warranties regarding the safety and efficacy of their product in purchasing and injecting the product.

112.    Members of the medical community, including physicians and other healthcare professionals, relied upon Merck's representations and express warranties in connection with the use recommendation, description, and dispensing of Merck's Zostavax vaccine.

113.    As a foreseeable, direct, and proximate result of the breach of the express warranties, the Plaintiffs suffered severe and permanent personal injuries, harm, and economic loss.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT V:
## BREACH OF IMPLIED WARRANTY

114.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

115.    At all times relevant to this action, Merck manufactured, compounded, portrayed, distributed, recommended, merchandised, advertised, promoted, and/or sold its Zostavax vaccine for use in preventing shingles.

116.    Merck knew of the intended use of its Zostavax vaccine at the time Merck marketed, sold, and distributed its product for use by the Plaintiffs' physicians and healthcare providers, and impliedly warranted the product to be of merchantable quality and safe and fit for its intended use.

117.    Merck impliedly represented and warranted to the medical community, the regulatory agencies, and consumers, including the Plaintiffs, thier physicians, and thier healthcare providers, that Zostavax vaccine was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

118.    Merck's representations and implied warranties were false, misleading, and inaccurate because its product was defective, and not of merchantable quality.

119.    At the time Merck's product was promoted, marketed, distributed, and/or sold by Merck, Merck knew of the use for which it was intended and impliedly warranted its product to be of merchantable quality and safe and fit for such use.

120.    The Plaintiffs, thier physicians and healthcare providers, and members of the medical community reasonably relied on the superior skill and judgment of Merck, as manufacturer, developer, distributor, and seller of the Zostavax vaccine as to whether it was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the product was manufactured and sold.

121.    Contrary to Merck's implied warranties, its product as used by the Plaintiffs was not of merchantable quality and was not safe or fit for its intended use because the product was unreasonably dangerous as described herein.

122.    Merck breached its implied warranty because its product was not safely fit for its intended use and purpose.

123.    Merck placed its product into the stream of commerce in a defective, unsafe, and inherently dangerous condition, and the product was expected to and did reach the Plaintiffs without substantial change in the condition in which it was manufactured and sold.

124.    As a foreseeable, direct and proximate result of Merck's acts and omissions and the Plaintiffs' use of Merck's defective product, the Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described herein.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

<u>COUNT VI:</u>
<u>NEGLIGENT MISREPRESENTATION</u>

125.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

126.    Merck had a duty to accurately and truthfully represent to the medical community, the FDA, and U.S. consumers, including the Plaintiffs, the truth regarding Merck's claims that Merck's product had been tested, and found to be safe and effective for its stated purposes.  The

misrepresentations made by Merck, in fact, were false and Merck was careless or negligent in ascertaining the truth of the representations at the time Merck made the misrepresentations.

127.    Merck represented and marketed Zostavax as being safe and effective.

128.    After Merck became aware of the risks of Zostavax, Merck failed to communicate to the Plaintiffs and other members of the general public, that the administration of this vaccine increased the risk of viral infection.

129.    Merck failed to exercise ordinary care in making representations concerning its product and its manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce.  Merck negligently and/or carelessly misrepresented and intentionally concealed the truth regarding the high risk of the product's unreasonable, dangerous and adverse side effects associated with the administration, use, and injection of the product.

130.    Merck breached its duty in representing to the Plaintiffs, thier physicians and healthcare providers, and the medical community that Merck's product did not carry the risk of serious side effects such as those suffered by the Plaintiffs and other similarly situated patients.

131.    Merck failed to warn the Plaintiffs, and other consumers, of the defective condition of Zostavax, as manufactured and/or supplied by Merck.

132.    Merck negligently misrepresented material facts about Zostavax in that it made such misrepresentations when they knew or reasonably should have known of the falsity of such misrepresentations. Alternatively, Merck made such misrepresentations without exercising reasonable care to ascertain the accuracy of these representations.

133.    The above misrepresentations were made to the Plaintiffs, as well as the general public.

134.    The Plaintiffs, and thier healthcare providers and physicians, justifiably relied on Merck's misrepresentations.

135.    Consequently, the Plaintiffs' use of Zostavax was to his detriment as Merck's negligent misrepresentations proximately caused the Plaintiffs' injuries and monetary losses.

136.    As a foreseeable, direct, and proximate result of Merck's negligent and/or willful, intentional, and knowing misrepresentations as set forth herein, Merck knew, or had reason to know, that Merck's product had not been sufficiently tested, that the product lacked adequate, accurate, and prominent warnings, and that injection with the product created a high risk of adverse health effects, and higher than acceptable risks of harm to users, and higher than reported and represented risks of adverse side effects such as those specifically described herein.

137.    As a direct and proximate consequence of Merck's negligent misrepresentations, the Plaintiffs sustained serious personal injuries and related losses including, but not limited to, the following:

a.    The Plaintiffs required and will continue to require healthcare and services;
b.    The Plaintiffs incurred and will continue to incur medical and related expenses; and
c.    The Plaintiffs suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, and other losses and damages.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT VII:
## UNJUST ENRICHMENT

138.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

139.    Merck is and at all times was the manufacturer, seller, and/or supplier of the shingles vaccine, Zostavax.

140.    The Plaintiffs paid for Merck's product for the purpose of preventing shingles.

141.    Merck has accepted payment by the Plaintiffs for the purchase of their product.

142.    The Plaintiffs have not received the safe and effective vaccine for which he paid.

143.    It would be inequitable for Merck to keep this money if the Plaintiffs did not in fact receive safe and effective treatment for the prevention of shingles.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT VIII
## LOSS OF CONSORTIUM

144.    Plaintiff GRACE BAUMGARTEN's spouse, Plaintiff MARK BAUMGARTEN, was and is at all times relevant herein the husband of Plaintiff GRACE BAUMGARTEN and as such, lives and cohabitates with her.

145.    By reason of the foregoing, Plaintiff GRACE BAUMGARTEN's spouse, Plaintiff MARK BAUMGARTEN has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

146.   By reason of the foregoing, Plaintiff GRACE BAUMGARTEN's spouse, Plaintiff MARK BAUMGARTEN, has been caused, presently and in the future, the loss of his wife's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

147.   Plaintiff JOHN KUSINCKAS's spouse, Plaintiff JEAN KUSINCKAS, was and is at all times relevant herein the wife of Plaintiff JOHN KUSINCKAS and as such, lives and cohabitates with him.

148.   By reason of the foregoing, Plaintiff JOHN KUSINCKAS's spouse, Plaintiff JEAN KUSINCKAS has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

149.   By reason of the foregoing, Plaintiff JOHN KUSINCKAS's spouse, Plaintiff JEAN KUSINCKAS, has been caused, presently and in the future, the loss of her husband's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

150.   Plaintiff LINDA KATZ's spouse, Plaintiff WILLIAM KATZ, was and is at all times relevant herein the husband of Plaintiff KINDA KATZ and as such, lives and cohabitates with her.

151.   By reason of the foregoing, Plaintiff LINDA KATZ's spouse, Plaintiff WILLIM KATZ has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

152.    By reason of the foregoing, Plaintiff LINDA KATZ's spouse, Plaintiff WILLIAM KATZ, has been caused, presently and in the future, the loss of his wife's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

153.    Plaintiff KATHRYN FREDE's spouse, Plaintiff RICHARD FREDE, was and is at all times relevant herein the husband of Plaintiff KATHRYN FREDE and as such, lives and cohabitates with her.

154.    By reason of the foregoing, Plaintiff KATHRYN FREDE's spouse, Plaintiff RICHARD FREDE has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

155.    By reason of the foregoing, Plaintiff KATHRYN FREDE's spouse, Plaintiff RICHARD FREDE, has been caused, presently and in the future, the loss of his wife's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

156.    Plaintiff MICHAEL LITTLE's spouse, Plaintiff BARBARA LITTLE, was and is at all times relevant herein the wife of Plaintiff MICHAEL LITTLE and as such, lives and cohabitates with him.

157.    By reason of the foregoing, Plaintiff MICHAEL LITTLE's spouse, Plaintiff BARBARA LITTLE has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

158.    By reason of the foregoing, Plaintiff MICHAEL LITTLE's spouse, Plaintiff BARBARA LITTLE, has been caused, presently and in the future, the loss of her husband's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

159.    Plaintiff VITTHAL PATEL's spouse, Plaintiff VILMA PATEL, was and is at all times relevant herein the wife of Plaintiff VITTHAL PATEL and as such, lives and cohabitates with him.

160.    By reason of the foregoing, Plaintiff VITTHAL PATEL's spouse, Plaintiff VILMA PATEL has necessarily paid and has become liable to pay for medical aid, treatment and medications, and will necessarily incur further expenses of a similar nature in the future.

161.    By reason of the foregoing, Plaintiff VITTHAL PATEL's spouse, Plaintiff VILMA PATEL, has been caused, presently and in the future, the loss of her husband's companionship, services, society and the ability of said Plaintiff's spouse in said respect has been impaired and depreciated, and the marital association between husband and wife has been altered, and as such, the Plaintiffs have been caused mental anguish and suffering.

**WHEREFORE,** the Plaintiffs demand judgment against Defendants, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgement against Defendants, and each of them, individually, jointly and severally and request compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

a. Compensatory damages for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by plaintiffs, health and medical care costs, lost wages, together with interest and costs as provided by law;

b. Restitution and disgorgement of profits;

c. Reasonable attorneys' fees;

d. The costs of these proceedings;

e. All ascertainable economic damages;

f. Punitive damages; and

g. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

___/s/ Mark T. Sadaka_____
Mark T. Sadaka, Esq.
Michael H. Bowman, Esq. (to be admitted
*Pro Hac Vice*)
**SADAKA ASSOCIATES, LLC**
Attorneys for Plaintiffs
155 North Dean Street, Suite 4-D
Englewood, NJ 07631
Tel: (201) 266-5670
Fax: (201) 266-5671
Email: mark@sadakafirm.com

Dated: May 25, 2018